**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | Criminal No. 11-14 |
| | ) | Judge Nora Barry Fischer |
| GEORGE KUBINI, DOV | ) | |
| RATCHKAUSKAS, SANDRA | ) | |
| SVARANOWIC and, ARTHUR SMITH, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

This complex mortgage fraud case returns to the Court to resolve the last dispute between some of the parties in what was more than contentious litigation that will now be brought to its conclusion. Briefly, the Court issued a 63-page Memorandum Opinion on June 14, 2017 and for reasons fully explained in that decision, imposed sanctions on the Government including: striking the testimony of the case agents; permitting Defendants to rely on any admissions they made during their testimony, and closing the record thereby precluding the Government from calling additional witnesses as it had proposed. (*See* Docket No. 688; *United States v. Kubini*, 2017 WL 2573872 (W.D. Pa. Jun. 14, 2017)). Presently before the Court is a motion for reconsideration filed by the Government wherein it expressly states that it accepts the sanctions imposed by the Court under the Memorandum Opinion but seeks an order removing certain of the Court's findings. (Docket No. 695). Defendants Dov Ratchkauskas and Arthur Smith filed briefs in opposition.[1] (Docket Nos. 706; 717). This motion has been held in abeyance while: the

---

[1]    Defendants George Kubini and Sandra Svaranowic did not file briefs as to this particular motion and also

1

parties negotiated resolutions to their disputes as to sentencing enhancements and restitution; the Court decided the remaining contest between the Government and Smith as to restitution; and, sentenced all of the Defendants in this case and the related matters. No further briefing has been requested by the parties and the motion is finally ripe for disposition. After careful consideration of the parties' arguments, and for the following reasons, the Government's Motion [695] is denied as it has failed to meet its heavy burden to demonstrate that reconsideration is appropriate.

## II. RELEVANT BACKGROUND

Because the Court writes primarily for the parties, who are well familiar with the facts of this case, and the details of same are extensively set forth in the June 14, 2017 Memorandum Opinion, (Docket No. 688), the Court focuses on the relevant background necessary for the disposition of this motion.

In the challenged decision, the Court granted a motion filed by Smith and found that the Government suppressed information regarding cooperating defendant Rochelle Roscoe including email communications between the prosecutor and case agents dated February 23, 2015 and a 5K1.1 motion filed under seal by the Government on Roscoe's behalf on March 9, 2015. (*See* Docket No. 688). The Government, through its assigned prosecutor, Assistant United States Attorney Brendan T. Conway ("AUSA Conway"), expressly conceded that those materials (as well as any information contained in its response to Smith's motion and the 5K1.1 motions filed as to several other individuals) could be considered by the Court when ruling on Smith's motion as well as the parties' numerous disputes regarding the applicability of various sentencing enhancements and the Defendants' liability for restitution. (*Id.*). The Court evaluated the testimony of the case agents, Special Agent Daniel Fisher ("SA Fisher") of the United States

did not participate in the briefing of the motion resulting in the Memorandum Opinion at issue in this decision.

Secret Service and Special Agent Amanda Avolia ("SA Avolia") of the Internal Revenue Service, during the sentencing enhancement and restitution proceedings in light of the withheld information to reach its findings contained in the Memorandum Opinion. (*Id.* at 39-41, 47-49, 52-53). The Court also assessed AUSA Conway's statements made in open court during the sentencing enhancement and restitution proceedings and in written briefs filed with the Court vis-à-vis the withheld information when making its findings. (*Id.* at 49-50, 53-56, 59-60). All told, the Court held that the Government: violated its obligations under *Brady/Giglio*; the Jencks Act; and this Court's Order, (Docket No. 494); failed to timely correct the record; and misrepresented certain of the facts contained in the withheld materials during the above-described proceedings while taking inconsistent positions in the separate case against Roscoe. (Docket No. 688 at 37, 62-63). The Court concluded that these actions undermined the fairness of the proceedings; hence, it imposed sanctions on the Government. (*Id.*).

On June 16, 2017, two days after the Court's ruling, the Government removed AUSA Conway as counsel. (Docket No. 691). Substitute counsel, AUSA Steven R. Kaufaman, entered his appearance as co-counsel along with AUSA Shaun Sweeney, who had been co-counsel for the prosecution but was not a subject of the Court's decision. (*Id.*). After the entry of new counsel, the Government sought two extensions of time to file the instant motion for reconsideration for the purposes of conducting a review of all materials in the case to determine if any additional materials under *Brady/Giglio* and the Jencks Act had been withheld and to decide what aspects of the Court's decision it would challenge. (Docket Nos. 690; 693). In granting the second request for extension, the Court noted its belief that the Government should have completed its review of these materials for any *Brady/Giglio* and Jencks Act material prior to responding to the initial motion and that it expected that the Government would turn over any

such materials found during this review promptly. (Docket No. 694). As the Court had done repeatedly during the sentencing enhancement and restitution proceedings—to no avail—it once again directed the parties to confer in an effort to resolve their disputes and notified the parties that it would withhold issuing its rulings[2] on same to permit the parties the opportunity to do so. (*Id.*).

The Government's motion for reconsideration concedes that its former counsel committed misconduct, "acknowledge[s] that his conduct and comportment in this matter have sometimes deviated from the high standards of the United States Attorney's Office and the Department of Justice" and states that the Court should not disturb the sanctions imposed or revise its order. (Docket No. 695). However, the Government advocates that the Court reconsider certain of its findings made in support of its decision including withdrawing any findings that the case agents knowingly made untrue statements to the Court and "withdrawing its finding[s] that AUSA Conway acted in bad faith, intentionally concealed discovery materials or made knowing misrepresentations to the Court." (Docket No. 695).

The Government supports its motion with affidavits from SA Avolia dated July 11, 2017 and SA Fisher dated July 7, 2017. (Docket Nos. 695-1; 695-2). In these affidavits, the case agents essentially review their prior testimony in light of the Court's findings, provide further context and explanation for their testimony and assert that they testified truthfully. (Docket Nos. 695-1; 695-2). SA Avolia also offers her recollection of a trial preparation session held on February 16, 2015 with Rochelle Roscoe and advises that she also located additional emails dated March 2, 2015 on which she was copied and included a draft of the 5K1.1 motion as an attachment but that she did not specifically recall those emails at the time she testified. (Docket

---

[2]      As the Court stated during the sentencing hearings of several of the codefendants, it had prepared a 105-page draft memorandum opinion which was to be issued shortly after the challenged June 14, 2017 Memorandum Opinion but was never released given that the parties subsequently reached stipulations on their disputes.

No. 695-1). The Government has not presented any additional evidence in support of this motion per se. (*See* Docket No. 695).

However, on July 18, 2017, the Government filed a "Certification of Compliance with Court Order of July 3, 2017" wherein it outlines the steps taken subsequent to the Court's earlier ruling in order to determine if any additional material was withheld that was covered by *Brady/Giglio*; the Jencks Act; or this Court's Orders. (Docket No. 702). To this end, AUSA Kaufman, AUSA Sweeney and former AUSA Michael Comber conducted an extensive review of the file materials in this case including emails among the prosecution team, and their written communications with borrower-victims. (*Id.* at 1-2). They also questioned SA Avolia, SA Fisher, AUSA Conway and the U.S. Attorney's Office Victim-Witness Coordinators. (*Id.*). This review led the Government to produce certain information to the defense including emails dated March 2 and 3, 2015 between AUSA Conway and SA Fisher, which were located by SA Avolia, who was copied on the email trail.[3] (Docket No. 703).[4] Those emails reveal that in the time period between the February 23, 2015 emails and the filing of the 5K1.1 motion on March 9, 2015, AUSA Conway forwarded a draft of the 5K1.1 motion for Rochelle Roscoe to the case

---

[3] In its Certification, the Government claims in conclusory fashion that these emails are not covered by *Brady/Giglio* because they contain the opinions of the prosecutor and agent, citing non-binding precedent from Courts of Appeals outside of the Third Circuit in support of same, i.e., *Morris v. Ylst*, 447 F.3d 735, 742-43 (9th Cir. 2006) and *United States v. Gaggi*, 811 F.2d 47, 58-59 (2d Cir. 1987). (Docket No. 702). For the reasons set forth in the body of this Memorandum Opinion, the Court does not reach this issue, as any such argument should have been raised prior to the disposition of the initial motion and was thereby waived by the Government. *See e.g., United States v. Dupree*, 617 F.3d 724, 728 (3d Cir. 2010) (finding issue waived and holding that "we do not require district judges to anticipate and join arguments that are never raised by the parties"), *id.* at 732-33 ("[t]hough motions to reconsider empower the court to change course when a mistake has been made, they do not empower litigants ... to raise their arguments, piece by piece.") (internal quotation omitted); *United States v. Perminter*, 2012 WL 642530, at *6 (W.D. Pa. Feb. 28, 2012) ("the Government cannot use a motion for reconsideration to raise new arguments in an attempt to salvage its otherwise deficient case after the Court has already issued its decision granting the Defendant's suppression motion."). In any event, it is well established that the work product doctrine does not provide an exception to the Jencks Act. *See Goldberg v. United States*, 425 U.S. 94, 102-103 (1976). Further, SA Fisher was a testifying witness during the sentencing enhancement and restitution proceedings.

[4] Based on the agreement of the parties, the Court authorized the Government to file Exhibit 1 to the Certification under seal, (Docket Nos. 699, 700, 701), but "[t]his Court's opinion will document any evidence it feels necessary to explain its determination, regardless of the parties' positions on confidentiality." *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, Civ. A. No. 09-290, 2013 WL 1336204, at *11 (W.D. Pa. Mar. 29, 2013).

agents and SA Fisher responded with edits and corrections to the draft document.

The relevant portions of those emails follow:

| | |
|---|---|
| **From:** | Conway, Brendan (USAPAW) <█████████████████> |
| **Sent:** | Monday, March 2, 2015 4:49 PM |
| **To:** | DANIEL FISHER (PIT) <████████████████>; Avolia Amanda (████████████) |
| **Subject:** | 5K Motion.docx |
| **Attach:** | 5K Motion.docx |

It is going to hurt filing this damned thing.

| | |
|---|---|
| **From:** | DANIEL FISHER (PIT) <████████████████> |
| **Sent:** | Tuesday, March 3, 2015 10:08 AM |
| **To:** | Conway, Brendan (USAPAW) <████████████████> |
| **Subject:** | 5K Motion.docx |
| **Attach:** | 5K Motion.docx |

See yellow/red corrections.

(Docket No. 703 at 2, 8). The version of the draft 5K1.1 motion for Roscoe which SA Fisher returned to AUSA Conway by email on March 3, 2015 contained the following relevant editing from SA Fisher:

> b. <u>Truthfulness, Completeness and Reliability</u>:
>
> In the government's view, the defendant occasionally provided truthful information throughout the course of her cooperation, but some ~~much~~ of that information was contradictory. Thus, the government did not view her as a particularly reliable witness. Perhaps the most useful portion of her cooperation was providing her mortgage broker files for the relevant transactions.

(Docket No. 703 at 6). As such, SA Fisher suggested that AUSA Conway change the statement that Roscoe occasionally provided truthful information but "some of that information was contradictory" to "much of that information was contradictory." (*See id.*).

In addition to these emails, the Government produced a series of emails between SA Fisher and one of Ratchkauskas' former girlfriends, Keri Alexander, text messages between her and Ratchkauskas which were apparently forwarded by email and other emails between AUSA Conway, U.S. Attorney staff and the case agents relaying information that she provided during phone calls. (Docket No. 703 at 9-17). Although not addressed in the earlier Memorandum Opinion, the Court finds these emails and their late disclosure troubling, at best. While Alexander did not testify at the proceedings, she was a hearsay declarant, with SA Fisher testifying as to statements that she had made to him and the Government admitting a report of a telephone interview SA Fisher conducted with her into the record. (*See* Docket No. 574 at 156). Like all witnesses who appear before this Court, SA Fisher was instructed not to talk to anyone about the substance of his testimony while on breaks in the proceedings. (*Id.* at 108 ("Mr. Fisher, as you know, you've taken the oath. Really you shouldn't be discussing your testimony with anybody over the lunch break.")).

Notably, one of the emails Alexander sent was received on a date between the two proceedings where SA Fisher testified and it related to the subject matter of that testimony. (*See* Docket No. 703 at 10). To this end, while on cross-examination on January 27, 2016, the following exchange occurred between Ratchkauskas' former counsel and SA Fisher:

> Q. The question is what I'm looking for is evidence that [Ratchkauskas] actually intended to use either passport for the purpose of violating the law and leaving the United States without permission. I don't see that evidence. The Government hasn't presented any. **As to Miss Alexander, did you investigate her background at all?**
> **A. No, I did not.**
> **Q. Do you know she has a history of mental illness?**
> **A. No, I did not.**
> Q. A long history of mental illness? And the evidence, even reading between the lines in her own letter, doesn't suggest to you that she's a bitter jilted person, that he's trying to get away from her

rather than take her somewhere?
A. I cannot speak to the letter. I'm not sure that I have seen the
letter you're referencing.
Q. It's filed with the Court.
A. Okay. I'm sorry. I don't believe I've seen this letter.

(Docket No. 574 at 169-70 (emphasis added)).   SA Fisher's testimony, however, was not

concluded on January 27, 2016 and was held over to the next session which was scheduled to

occur on February 23, 2016.   Two days before that hearing, on Sunday, February 21, 2016 at

3:46 p.m., SA Fisher received an email from Kerri Alexander.   (Docket No. 703 at 10).   He

forwarded the email to AUSA Conway and SA Avolia on Monday, February 22, 2016 at 9:49

a.m. stating merely "FYI" and including the full text of the email he had received from

Alexander.   (*Id.*).   In the email, Alexander states that she is not **"as mentally incompetent as**

**Dov claims.   If I was that mentally incompetent, he's sure one hell of a bastard throwing**

**me out of the house he said was mine and with kids."**   (*Id.*).   When SA Fisher retook the

witness stand on Tuesday, February 23, 2016, AUSA Conway made no mention of this email

which they had all received a day or two before the continued hearing.   (*See* Docket No. 575 at

7-150).   Nevertheless, the Government later utilized Alexander's statements in its proposed

findings of fact and conclusions of law in support of its request for an obstruction of justice

enhancement against Ratchkauskas in an effort to prove that he had attempted to flee the

jurisdiction to avoid being sentenced and incarcerated.   (*See* Docket No. 630 at ¶ 155 (filed

8/5/2016)).

Ratchkauskas' Brief in Opposition to the Government's Motion for Reconsideration

argues that the Government failed to meet its burden on reconsideration to demonstrate any

change in the law or legal or factual error in the decision and had not presented any new

evidence sufficient to justify reconsidering the findings as to AUSA Conway but would defer to

the Court's discretion to determine whether the affidavits proffered by the case agents should justify reconsideration. (Docket No. 720).   Smith likewise opposed the Government's motion, advocating that the motion should be denied as the affidavits presented by the Government do not constitute "new evidence" in the context of motions for reconsideration, citing several of this Court's prior decisions on that point, and similarly noting the failure of the Government to present any additional facts from AUSA Conway which were not known to the Court prior to ruling on the matter. (Docket No. 717 at 2-4).   Smith further maintained that reconsideration should be denied given the Government's concession that the sanctions should remain in place. (*Id*. at 4).   Despite the defense identifying these alleged defects in the motion, the Government did not seek leave to respond via a reply brief or otherwise.   The parties also did not request a hearing or argument on this motion.

As noted, the Court afforded the parties several months to negotiate resolutions and they eventually reached stipulations with respect to the advisory guidelines ranges in the cases against Ratchkauskas (57-71 months); Kubini (57-71 months); Smith (33-41 months); and Svaranowic (21-27 months).   (*See* Docket Nos. 712-2; 725; 727; 741).   The stipulated ranges were remarkably less than those proposed by the Government during the sentencing enhancement proceedings, i.e., Ratchkauskas (324 months to life); Kubini (210-262 months); Smith (168-210 months); and Svaranowic (57-71 months).[5]   (*See* Docket No. 630-2).   The Government also reached stipulations as to restitution with Ratchkauskas; Kubini; Svaranowic; Joel Reck; and, Rochelle Roscoe.   (*See* Docket Nos. 712-2; 727; 741).   Each of these defendants was ordered to pay a total of $862,358.13, except for Svaranowic, who was ordered to pay $400,000.00. (Docket Nos. 715; 723; 747; 782).   In Smith's case, the parties could not agree on restitution, so

---

[5]        The Court notes that sentencing stipulations with Kubini and Ratchkauskas also included the parties' agreements pursuant to Rule 11(c)(1)(C) that appropriate sentences in their cases would be within the range of 57-60 months' incarceration.  (Docket Nos. 712-2; 741).

the Court resolved their disputes and ordered him to pay $321,689.13 to JP Morgan Chase. (See Docket Nos. 725; 740; 780). Like the stipulated advisory guidelines ranges, the amounts of restitution ordered were far less than the amounts initially sought by the Government. (*See* Docket No. 630).

Over the course of the next year, the Court proceeded to sentence each of these defendants, starting with Ratchkauskas on July 25, 2017 and ending with Reck on June 29, 2018. As it does in every sentencing hearing, the Court carefully considered all of the evidence of record, addressed the parties' plea agreements and stipulations; ruled on any objections lodged by the parties and all of the motions they presented; and then conducted an individualized assessment of all of the factors under 18 U.S.C. § 3553(a) prior to imposing their sentences which the Court believes were sufficient but not greater than necessary to meet the goals of sentencing in each case. The Court's statement of reasons supporting the sentences were fully set forth on the record at each hearing and need not be restated here.

The ultimate disposition of these matters was the following:

- Ratchkauskas was sentenced on July 25, 2017 to 57 months' incarceration, 5 years' supervised release and ordered to pay $863,562.13 in restitution[6] and a $200 special assessment, (Docket Nos. 715; 723);

- Kubini was sentenced on January 5, 2018 to 60 months' incarceration, 5 years' supervised release and ordered to pay $863,562.13 in restitution and a $300 special assessment, (Docket No. 747);

- Smith was sentenced on April 11, 2018 to 1-day incarceration, 3 years' supervised release, with conditions including 9 months' home confinement and 12 hours a week of community service for the duration of the term of supervised release (a total of 1,872 hours) and ordered to pay $321,689.13 in restitution and a $300

---

[6]     The Clerk's Office reports that as of September 5, 2018, the following amounts have been paid toward restitution: $400,099.52 was paid by Ratchkauskas, most of which was paid from forfeitures; $1,403.08 was paid by Smith; $153.50 was paid by Svaranowic; and $0.58 was paid by Kubini.

special assessment, (Docket No. 780);

- Svaranowic was sentenced on April 13, 2018 to 1-day incarceration, 2 years' supervised release, with conditions including 200 hours of community service and ordered to pay $400,000.00 in restitution and a $100 special assessment, (Docket No. 782);

- Roscoe was sentenced on April 25, 2018 to a term of 5 years' probation, with conditions including 6 months' home confinement and ordered to pay $862,358.13 in restitution and a $100 special assessment. (Crim. No. 11-17, Docket No. 69). However, the home confinement condition was subsequently removed at the request of the probation office, (*Id.* at Docket No. 73);

- Reck was sentenced on June 29, 2018 to 2 years' probation, with conditions including 100 hours of community service and ordered to pay $862,358.13 in restitution and a $100 special assessment, (Crim. No. 11-221, Docket No. 97).

No appeals were filed challenging the sentences in any of these cases, making all of the judgments final. Therefore, the only matter remaining is disposition of the pending motion, which the Court will address after recounting the governing legal standard.

## III. LEGAL STANDARD

The purpose of a motion for reconsideration "is to correct manifest errors of law or fact or to present newly discovered evidence." *Kabacinski v. Bostrom Seating, Inc.*, 98 F. App'x 78, 81 (3d Cir. 2004) (quoting *Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir. 1985)); *United States v. Kalb*, 891 F.3d 455, 467 (3d Cir. 2018). Because "federal courts have a strong interest in the finality of judgments," *United States v. Hoey*, Cr. No. 09-200, 2011 WL 748152, at \*2 (W.D. Pa. Feb. 15, 2011) (citation omitted), the standard that must be met to prevail on a motion for reconsideration is high, *see Berry v. Jacobs IMC, LLC*, 99 F. App'x 405, 410 (3d Cir. 2004).

The Court may grant a motion for reconsideration if the moving party shows: (1) an intervening change in the controlling law; (2) the availability of new evidence which was not

available when the court issued its order; or (3) the need to correct a clear error of law or fact or to prevent a manifest injustice. *United States v. Banks*, Crim No. 03-245, 2008 WL 5429620, at *1 (W.D. Pa. Dec. 31, 2008) (citing *Max's Seafood Café by Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999)). Motions for reconsideration are not a tool to re-litigate and reargue issues which have already been considered and disposed of by the Court, *see Hoey*, 2011 WL 748152, at *2 (citation omitted), to express disagreement with the Court's rulings, *see United States v. Perminter*, Cr. No. 10-204, 2012 WL 642530, at *7 (W.D. Pa. Feb. 28, 2012), or for addressing arguments that a party should have raised earlier, *see United States v. Dupree*, 617 F.3d 724, 732-33 (3d Cir. 2010) (quotations omitted); *Kalb*, 891 F.3d at 467. Rather, such a motion is appropriate only where the court misunderstood a party or where there has been a significant change in law or facts since the Court originally ruled on that issue. *Hoey*, 2011 WL 748152, at *2. At least at the District Court level, motions for reconsideration should be sparingly granted. *See Cole's Wexford Hotel, Inc. v. UPMC and Highmark, Inc.*, 2017 WL 432947, *2 (W.D. Pa. Feb. 2, 2017).

## IV. DISCUSSION

Returning to the parties' arguments, the Government asserts a narrow challenge to certain of the Court's findings supporting its June 14, 2017 Memorandum Opinion based on the provision of alleged "new evidence" from the Special Agents and its position that a purported "manifest injustice" would result if such findings were not removed from the Court's decision. (Docket No. 695). Specifically, the Government advocates that the Court should withdraw findings that Special Agents Avolia and Fisher "knowingly made untrue statements to the Court" and withdraw findings that AUSA Conway "acted in bad faith, intentionally concealed discovery materials or made knowing misrepresentations to the Court." (Docket No. 695 at 20).

Ratchkauskas and Smith oppose the Government's motion, arguing that it has failed to meet its burden to demonstrate that reconsideration is appropriate. (Docket Nos. 706; 717). Having carefully considered the parties' arguments in light of the relevant legal standard, reconsideration will be denied. However, the Court clarifies its assessment of SA Avolia's testimony in light of her admission that she was unprepared to testify about the 5K1.1 motion filed on behalf of Rochelle Roscoe.

At the outset, the Court notes that the Government is <u>not</u> asking the Court to reevaluate its assessment of the credibility of the Special Agents or the intent of the former lead prosecutor in light of all of the facts that are <u>now</u> known concerning the subject of the June 14, 2017 Memorandum Opinion including the additional contemporaneous emails which were produced a month <u>after</u> that decision in July of 2017. Rather, the Government is requesting that the Court consider its Brief and the affidavits of the Special Agents and then revise its opinion by withdrawing or eliminating certain findings that the Government believes are unfavorable to its personnel. (*See* Docket No. 695). At the same time, the Government admits that its former counsel in this case, AUSA Conway, committed misconduct and that "his conduct and comportment in this matter have sometimes deviated from the high standards of the United States Attorney's Office and the Department of Justice," (Docket No. 695 at 12), echoing some of the Court's own comments about what occurred in this litigation. The Government has not cited any authority supporting its requests for the specific relief of eliminating unfavorable findings from a decision without altering the outcome. (*See* Docket No. 695). Instead, the Government posits that this type of relief is appropriate because its new counsel was prepared to negotiate in good faith with Defendants in order to resolve the remaining disputes as to sentencing enhancements and restitution, which it ultimately did, and because the Court could

have issued a narrower ruling finding unintentional *Brady* violations and imposed the same sanctions, which it does not contest. (*Id.*).

In this Court's estimation, reconsideration is not appropriate on these bases as all of the Government's arguments could have been raised prior to the Court issuing its decision and are otherwise precluded by the standard governing motions for reconsideration. *See Kalb*, 891 F.3d at 467. The Court reaches this decision for several reasons.

First, many Courts, including this one, have denied motions for reconsideration when the asserted factual or legal errors would not alter the result of the initial decision. *See e.g., Graham v. Progressive Direct Ins. Co.*, 2010 WL 3092684 at *2 (W.D. Pa. Aug. 6, 2010) ("A motion for reconsideration relying on the discovery of new evidence subsequent to an initial order should only be granted if the party presenting the new evidence demonstrates that the new evidence would have changed the initial rulings."); *United States v. Veolia Environment N. Am. Operations, Inc.*, Civ. A. No. 13-MC-03-LPS, 2015 WL 4454905, at *1 (D. Del. July 17, 2015) ("the Court may deny the motion [for reconsideration] if it would not alter the outcome."); *United States v. Bullard*, Civ. A. No. 07-1535, 2007 WL 2597947, at *2 (E.D. Pa. Sept. 4, 2007) ("the party seeking reconsideration must show that correction of the factual or legal error would reasonably result in a different outcome."). Here, the Government accepted the sanctions imposed by the Court, the parties' disputes as to guidelines enhancements and restitution were largely resolved by stipulations, each of the Defendants has been sentenced and no appeals have been taken. Therefore, any Order reconsidering the prior decision would have no effect on this now-concluded litigation.

Second, the decision sets forth this Court's views regarding: the need for the Government to comply with its disclosure obligations under the Jencks Act, *Brady/Giglio*, and this Court's

Orders; the importance of counsel's duties of candor to the Court[7] and to timely correct the record; and, the Court's responsibility to ensure the fundamental fairness of sentencing hearings.[8] While the opinion was issued for the purpose of resolving some of the disputes in this litigation, it is not the property of counsel or the litigants. *See Lyttle v. AT&T Corp.*, 2013 WL 6008494, at *2 (W.D. Pa. Nov. 13, 2013) ("judicial precedents are presumptively correct and valuable to the legal community as a whole. They are not merely the property of private litigants and should stand unless a court concludes that the public interest would be served by a vacatur.") (internal quotation omitted). The fact that the parties resolved their disputes subsequent to the Court's ruling does not provide a basis to set aside the decision at the behest of some of the Government participants who believe their personal interests may be adversely affected in some manner. *See e.g., Sloane v. Gulf Interstate Field Services, Inc.*, Civ. A. No. 15-1208, 2016 WL 4037326, at *2 (W.D. Pa. Jul. 28, 2016) ("In this instance, the private interests of counsel in the judicial opinion do not outweigh the interests of the public and future litigants who must understand all of the bases supporting the Court's ruling."). As the Court of Appeals has held,

> Judicial opinions are the core work-product of judges. They are much more than findings of fact and conclusions of law; they constitute the logical and analytical explanations of why a judge arrived at a specific decision. They are tangible proof to the litigants that the judge actively wrestled with their claims and arguments and made a scholarly decision based on his or her own reason and logic. When a court adopts a party's proposed opinion as its own, the court vitiates the vital purposes served by judicial opinions.

---

[7]     *See, United States v. Kubini*, 304 F.R.D. 208, 213 (W.D. Pa. 2015); *see also Wise v. Washington County, et al.*, Civ. A. No. 10-1677, 2015 WL 1757730 (W.D. Pa. Apr. 17, 2015); *Trask v. Olin Corp.*, 298 F.R.D. 244, 271 (W.D. Pa. Mar. 4, 2014); *Square D. Co. v. Scott Electric Co.*, 2008 WL 2779067 (W.D. Pa. Jul. 15, 2008).

[8]     The Court notes that the same is consistent with the mission statement of the United States District Court for the Western District of Pennsylvania which "is to preserve and enhance the rule of law while providing an impartial and accessible forum for the just, timely and economical resolution of legal proceedings within the court's jurisdiction, so as to protect individual rights and liberties, promote the public trust and confidence in the judicial system, and to maintain judicial integrity." *See* U.S. District Court for the Western District of Pennsylvania, *Court Information, available at:* http://www.pawd.uscourts.gov/court-information (last visited 9/5/18).

*Bright v. Westmoreland Cty.*, 380 F.3d 729, 732 (3d Cir. 2004). It is also well-settled that a party's disagreements with the Court's rulings do not justify reconsideration, *Perminter*, 2012 WL 642530, at *7, and the Court need not revise its June 14, 2017 Memorandum Opinion at the Government's request to adopt the version of the facts that the Government and its personnel believe are most favorable to them. *See also Lyttle v. AT&T Corp.*, 2013 WL 6008494, at *3 (W.D. Pa. Nov. 13, 2013) (noting the independence of the Judiciary and holding that "the Court should not accede to the demands of a co-equal branch of our Government to vacate adverse precedent, absent exceptional circumstances which are not present here.").

Third, the Government was provided <u>multiple</u> opportunities to take the position that it now cedes to the Court by admitting that a *Brady* violation occurred but the Government <u>repeatedly</u> contested such a finding throughout the course of these proceedings. *See e.g.*, Docket No. 620 at 11 (8/2/16) (contesting that a *Brady* violation occurred as the withheld information was not material); Docket No. 644 at 111 (8/22/16) ("On page 2, defendant Smith suggests that the government has conceded that its failure to timely disclose the Rochelle Roscoe impeachment materials constituted a Brady violation. The government does not concede that this amounted to a Brady violation."); Docket No. 651 at 60 (8/30/16) ("Smith […] [makes] numerous ad hominem allegations of prosecutorial misconduct. The allegations are […] meritless."); Docket No. 661 at 15 (9/6/16) ("The asserted <u>Brady</u> violation, which stems from AUSA Conway's alleged failure to disclose subjective opinions about the credibility of Rochelle Roscoe, is without merit."). While disputing the *Brady* violation, the Government failed to provide authority in support of its position and specifically did not raise the precedent cited in its July 18, 2017 Certification.[9] (*See* Docket No. 702). Moreover, the Court had issued a Show

---

[9]     Indeed, the Government has now apparently abandoned any such argument by conceding this point and not otherwise contesting the legal bases for the Court's imposition of the sanctions.

Cause Order on the Government, under seal, inviting a sealed response by the Government as to why its obligations under *Brady/Giglio* and the Jencks Act did not require the production of the 5K1.1 motion to Kubini, Ratchkauskas, Smith and Svaranowic but the Government chose not to respond.[10] (*See* Docket No. 688 at n.17). The Court also advised the Government three months before ruling on the matter that it would address the appropriate sanction for withholding this information in a later decision. (Docket No. 685 at 4 (3/9/17) ("As the parties are aware, that matter remains under advisement given the extensive record in this case, and the Court will separately address the appropriate sanction for the United States' admitted failure to produce the 5K motions of cooperating witnesses as well as emails between counsel and the case agents prior to the testimony of Special Agents Daniel Fisher and Amanda Avolia.")).

Fourth, it is well established that evidence provided in response to an adverse ruling which was previously available to the moving party does not constitute "new evidence" sufficient to justify reconsideration. *See Durst v. Durst*, 663 F. App'x 231, 237 (3d Cir. 2016) ("while a motion to reconsider can be based on new evidence, 'new' in this context means evidence that could not have been submitted to the court earlier, because it was not previously available, not simply evidence submitted after an adverse court ruling."). The Government has not argued that the Special Agents were unavailable to provide the affidavits prior to the Court's initial ruling. (*See* Docket No. 695). There is also nothing in the record suggesting that the agents were unavailable during the proceedings to review the transcripts of their testimony against the evidence which was withheld from the defense and to provide any additional

---

[10]    The Court notes that § 9-5001(D)(3) of the U.S. Attorneys' Manual states the following:
> **3. Exculpatory or impeachment information casting doubt upon sentencing factors.**  Exculpatory and impeachment information that casts doubt upon proof of an aggravating factor at sentencing, but that does not relate to proof of guilt, must be disclosed no later than the court's initial presentence investigation.

U.S. Attorney's Manual, § 9-5001(D)(3).

information to the Court that they felt should be considered as part of the Government's response to the motion. *See Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 252 (3d Cir. 2010) ("Nothing in the record suggests that the evidence the Plaintiffs sought to present post-summary judgment was unavailable to them when they filed their summary judgment motion."). In fact, the transcripts had been produced and filed with the Court for several months and the withheld evidence was in the possession of the Government throughout these proceedings. (*See 1/17/16 Hr'g Trans.*, Docket No. 574 (filed 5/9/16); *2/23/16 Hr'g Trans.*, Docket No. 575 (filed 5/9/16); *5/13/16 Hr'g Trans.*, Docket No. 603 (filed 6/21/16)). If they were not provided the opportunity to do so, it was not because of any actions of the Court.[11]

Fifth, like any other litigant, the Government is bound by the decisions of its former counsel who pursued a legal strategy which included: not responding to the Court's Show Cause Order; repeatedly contesting that a *Brady* violation occurred; and conceding that the withheld materials could be admitted into the record and considered by the factfinder without presenting affidavits from the Special Agents. *See Lehman Bros. Holdings v. Gateway Funding Diversified Mortgage Servs., L.P.*, 785 F.3d 96, 102 (3d Cir. 2015) (quoting *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–34, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) (parties cannot "avoid the consequences of the acts or omissions of [their] freely selected agent[s]. Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent[.]")). "It is not the job of courts deciding motions for reconsideration

---

[11] It is the duty of the presenting attorney to adequately prepare a witness prior to testifying, which, in this Court's estimation, requires reviewing documents with the witness, going over the witness' direct examination and also preparing the witness for cross-examination through mock questions or otherwise. *Cf. Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347 (1974) ("Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.").

to rescue parties from their strategic litigation choices" or "to rescue parties from their own errors." *Conway v. A.I. duPont Hosp. for Children*, No. CIV. A. 04-4862, 2009 WL 1492178, at *7 (E.D. Pa. May 26, 2009). Thus, neither the Government nor its witnesses can complain that the Court erred by making its credibility findings with reference to exhibits which were presented by the former lead prosecutor and admitted into the record with his consent. Further, any such arguments are deemed waived. *See Dupree*, 617 F.3d at 728.

All told, even if the Court accepted the Government's premise that the sanctions could be justified without certain of its factual findings, a view the Court does not wholly share, reconsideration is not appropriate because the Government could have raised all of its current arguments earlier. *See Kalb*, 891 F.3d at 467. As the Court of Appeals has held,

> even the most learned judges are not clairvoyant. Thus, we do not require district judges to anticipate and join arguments that are never raised by the parties. Instead courts rely on the litigants not only to cite relevant precedents, but also to frame the issues for decision.

*Dupree*, 617 F.3d at 728 (citations omitted). Therefore, the Government cannot obtain reconsideration by reversing its previously asserted legal position to concede that an unintentional *Brady* violation occurred and asking the Court to re-write its decision to fit its preferred narrative. *Id.* Accordingly, the Government's motion is denied to the extent that it relies upon a new legal theory or upon matters which do not constitute "new evidence" under Third Circuit jurisprudence. *See Kalb*, 891 F.3d at 467.

The Government alternatively maintains that certain of the Court's findings should be revised because a "manifest injustice" will result if they stand. (Docket No. 695). To this end, the Government continues that it may need to produce the Court's decision as *Giglio* material in future cases if the Special Agents are called to testify or act as affiants and that AUSA Conway

may be subject to discipline by the Department of Justice due to his handling of this matter.

(*Id.*). Defendants oppose this theory as well. (Docket Nos. 706; 717).

Once again, the Government has failed to meet its heavy burden to demonstrate that reconsideration of any of its findings is justified under its "manifest injustice" theory. In the context of motions for reconsideration,

> [m]anifest injustice "[g]enerally […] means that the Court overlooked some dispositive factual or legal matter that was presented to it." *Rose v. Alternative Ins. Works, LLC*, Civ. Action No. 06-1818, 2007 WL 2533894, at *1 (D.N.J. Aug. 31, 2007). Manifest injustice has also been held to occur where there is "'an error in the trial court that is direct, obvious, and observable.'" *Greene v. Virgin Islands Water & Power Auth.*, Civ. Action No. 06-11, 2012 WL 4755061, at *2 (D.V.I. Oct. 5, 2012) (quoting *Tenn. Prot. & Advocacy, Inc. v. Wells*, 371 F.3d 342, 348 (6th Cir. 2004)). Manifest injustice is a high burden for any party to meet. *Conway v. A.I. duPont Hosp. for Children*, Civ. Action No. 04-4862, 2009 WL 1492178, at *6 (E.D. Pa. May 26, 2009) (quoting *Curry v. Eaton Corp.*, Civ. Action No. 07–5, 2008 U.S. Dist. LEXIS 48551, at *43, 2008 WL 2559249 (W.D. Ky. June 24, 2008)) (purporting that manifest injustice "implies that the Court must be faced with a [record] so patently unfair and tainted that the error is manifestly clear to all who view the record"); *Shirlington Limousine & Transp., Inc. v. United States*, 78 Fed. Cl. 27, 31 (2007) (quoting *Pac. Gas & Elec. Co. v. United States*, 74 Fed. Cl. 779, 785 (2006)) ("[w]here reconsideration is sought due to manifest injustice, the moving party can only prevail if it demonstrates that the injustice from the case is 'apparent to the point of being indisputable' "). In applying such a demanding standard, courts have consistently used a scrutinizing hand.

*Black Bear Energy Servs., Inc. v. Youngstown Pipe & Steel, LLC DNV Energy, LLC*, Civ. A. No. 15-50, 2017 WL 2985432, at *6 (W.D. Pa. July 13, 2017) (footnotes omitted); *see also Volkay v. Court of Common Pleas of Allegheny Cty.*, Civ. A. No. 14-193, 2016 WL 3671542, at *4 (W.D. Pa. July 11, 2016) (internal quotations omitted) ("Manifest injustice has also been defined as 'an error in the trial court that is direct, obvious and observable' or 'an unjust state of affairs.'").

After carefully scrutinizing the Government's motion, affidavits, certification and

arguments and after thoroughly reviewing the June 14, 2017 Memorandum Opinion as well as the pertinent portions of the record in light of this standard, the Court concludes that the Government has not demonstrated manifest injustice. *See id.* To that end, the Government has not pointed to any error that is direct, obvious and observable to all who read the June 14, 2017 Memorandum Opinion. Yet, the Court will address each of the Government's arguments, in turn. *See United States v. Kubini*, 304 F.R.D. 208, 214 (W.D. Pa. Jan. 5, 2015) ("this Court retains the inherent authority to interpret its own Orders").

With respect to the Special Agents, the Government asks the Court to withdraw any findings that they "knowingly made untrue statements to the Court," (Docket No. 695), but a careful review of the decision reveals that the Court did not expressly make such findings. (*See* Docket No. 688).

On review, the only reference to something being untruthful in the Court's discussion as to SA Fisher's testimony regarded his response that a number of things that Rochelle Roscoe told him were untrue. (*See* Docket No. 688 at 47-48). This was merely a restatement of his own testimony and no more. Since the Court did not state that SA Fisher knowingly made any untrue statements, there are no such findings to withdraw or amend.

As to the Court's findings regarding SA Avolia, the Court cited Third Circuit precedent for the proposition that when "a witness' answer, although made in good faith, is untrue," a prosecutor has a duty to correct that testimony. (*Id.* at 51-52 (quoting *United States v. Stadtmauer*, 620 F.3d 238, 268 (3d Cir. 2010)) (further quotation omitted)). The Court then noted that because SA Avolia was sent an email by AUSA Conway requesting information to be put into the 5K1.1 motion he was preparing, "it cannot be reasonably argued" that her testimony in response to questioning of whether a 5K1.1 motion had been filed for Rochelle Roscoe was

true or accurate and further commented that the prosecutor should have corrected the testimony because he obviously knew it was untrue. (*Id.* at 52). The Court also noted that even if SA Avolia had not read the email, i.e., she did not know about it, the prosecutor's duty to correct the testimony remained the same and listed numerous opportunities for him to have done so before she even took the witness stand. (*Id.* at 53). Simply put, at no time throughout this discussion did the Court state that SA Avolia knowingly provided untruthful testimony. Rather, a fair reading of this portion of the decision indicates that the Court recognized that a witness could, in good faith, provide an untrue answer to a question which would cause the prosecutor's duty to correct the record to arise and the Court pointed to an example of such an instance in this record by comparing SA Avolia's testimony to the prosecutor's own email communication addressed to her. (*Id.* at 51-53). Again, as there are no express findings that SA Avolia knowingly testified untruthfully, there is nothing for the Court to withdraw or amend. (*See* Docket No. 695-1). With that said, the Court accepts her representation in her affidavit that she did not recall the emails at the time of the testimony as well as her acknowledgement that she was unprepared to answer the question.[12] (*Id.*).

To the extent that the Government's motion is read more broadly as challenging any of the Court's comments regarding the credibility of these witnesses, as the Court has already mentioned, disagreements concerning such matters which are committed to the discretion of the Court do not support reconsideration. *Perminter*, 2012 WL 642530, at *7. The Court, as the finder of fact, was free to accept or reject any of their testimony, whether they were impeached or not, and their status as law enforcement officers did not make their testimony any more or less credible. *See e.g., United States v. Murphy*, 402 F. Supp. 2d 561, 569-70 (W.D. Pa. 2005) ("Credibility determinations are to be made in consideration of numerous factors, including the

---

[12] *See* n.11, *supra.*

witness's demeanor and manner while on the stand, the witness's ability to accurately recollect the matters at hand, the manner in which the witness may be affected by the outcome, the extent to which the witness's testimony is either supported or contradicted by other evidence and testimony in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic."); *United States v. Davis*, Crim. No. 2:13-CR-00068, 2014 WL 1394304, at *3 (W.D. Pa. Apr. 9, 2014) (same); *United States v. Bethancourt*, 65 F.3d 1074, 1080 (3d Cir. 1995) (approving jury instruction that "the government witnesses' testimony was not entitled to any greater consideration because of their federal employment."); 3d Cir. Model Crim. Jury Inst. § 4.18, *Credibility of Witnesses – Law Enforcement Officer* ("The fact that a witness is employed as a law enforcement officer does not mean that (his)(her) testimony necessarily deserves more or less consideration or greater or lesser weight than that of any other witness."). The Government is also <u>not</u> asking the Court to revise its credibility determinations in light of the now expanded record[13]; rather it seeks to eliminate the prior findings completely, which is relief this Court does not believe is justified for reasons it has already described above.[14]

---

[13]     To this end, SA Fisher said in a contemporaneous email on February 23, 2015 that Roscoe was "completely not credible" and "minimized her testimony" every time they spoke and also suggested on March 3, 2015 that the 5K1.1 motion be changed to read "[i]n the government's view, the defendant occasionally provided truthful information throughout the course of her cooperation, but [much] of that information was contradictory." Hence, SA Fisher changed the word "some" to "much." Then, when SA Fisher testified on January 27, 2016, he was asked by defense counsel "[i]n fact, is it fair to say that <u>much</u> of what Miss Roscoe told you at various stages of the interviews turned out not to be true?" SA Fisher responded "A number of things that she stated were untrue." In this Court's estimation, the finding that this testimony was a "far cry" from the emailed assessment is further supported by the changes SA Fisher made to the language of the 5K1.1 motion.

          With respect to the Government's position that SA Fisher would rely on Roscoe's statements only if it was corroborated by other evidence, there was no evidence to corroborate Roscoe's testimony that Smith drafted the letter to his title insurer, with SA Fisher admitting that his sole source of that information was Roscoe. (Docket No. 574 at 166). Smith admitted to the grand jury that he edited the letter but the Government did not seize and analyze their computers or otherwise investigate who actually drafted the letter. It was a classic "he said, she said" situation and the Government knew that the "she" was unreliable but sought admission of the evidence anyway.

[14]     The Court further declines to provide an advisory opinion as to whether its decision – which is public record in any event – should be produced as *Giglio* materials in future proceedings. *See United States v. Kubini*, 304 F.R.D. 208, 213 (W.D. Pa. 2015) (citing *Burkey v. Marberry*, 556 F.3d 142, 149 (3d Cir. 2009) (recognizing that a "District Court may not render an advisory opinion")). As always, the Government should be guided by relevant statutes, precedential caselaw, § 9-5.000 of the U.S. Attorney's Manual, the Federal Rules of Criminal Procedure, Local Rules of Court and any rulings in those particular cases.

Lastly, the Court turns to the Government's motion to reconsider the Memorandum Opinion as to AUSA Conway wherein it argues that the Court should withdraw any findings that he "acted in bad faith, intentionally concealed discovery materials or made knowing misrepresentations to the Court." (Docket No. 695 at 20). The Government speculates that AUSA Conway may face "extremely serious" discipline by the Department of Justice if the Court does not withdraw such findings. [15] (*Id.* at 2). At the same time, the Government concedes that he committed misconduct and that his performance in this litigation did not always comport with the high standards of the Office of the U.S. Attorney for the Western District of Pennsylvania and the Department of Justice. (*Id.* at 12). But, the Government asks for the revisions in the Court's Opinion to "ensure that AUSA Conway is held accountable only for conduct which actually violated ethical and professional standards." (*Id.* at 3).

The Court's review of its decision reveals that it did not make any explicit findings that AUSA Conway "acted in bad faith, intentionally concealed discovery materials or made knowing misrepresentations to the Court." Indeed, the only references to "bad faith," "intentional," or "knowing" in the Court's decision are contained in quotations or parenthetical citations to other legal sources. *See e.g.*, Docket No. 688 at 43 (citing *Brady* with parenthetical); at 52 (quoting *United States v. Harris*, 492 F.2d 1164, 1169 (3d Cir. 1974) ("the Government's obligation to correct that statement is as compelling as it is in a situation where the Government knows that the witness is intentionally committing perjury."); at 33 (citing 3d Cir. Model Crim. Jury Instr. § 4.26 ("If you believe that a witness knowingly testified falsely …."); at 49 (citing *Kubini*, 304 F.R.D. at 225 ("The Court's inquiry does not end here as attorneys also owe a duty of candor to the Court to not knowingly …"). Hence, the Court cannot withdraw findings from

---

[15] The Court notes that AUSA Conway has continued to appear regularly before the Court on other matters since the Memorandum Opinion was issued.

the decision that it did not expressly make.

The Court did state that "the Government did not act in good faith" and that the prosecutor, AUSA Conway, committed a serious due process violation which undermined the fundamental fairness of these proceedings. (Docket No. 688 at 57, 63). While it may be plausible for a prosecutor to "forget" to produce documents such as the Roscoe 5K1.1 motion and the emails to defense counsel, there is no evidence in this record supporting a conclusion that the <u>content</u> of such material was forgotten. Again, AUSA Conway affirmatively sought the admission of statements from a hearsay declarant, Roscoe, that both he and his testifying agent knew was unreliable and repeatedly contested an objection that the statements from this source were inherently unreliable. The Court also held that AUSA Conway's various assurances that the Government complied with its obligations under *Brady/Giglio* and the Jencks Act misrepresented to the parties and the Court that he had complied when clearly he had not done so. Indeed, the record is undisputed that AUSA Conway: ignored several demands by defense counsel for these types of materials <u>prior</u> to the commencement of the sentencing enhancement and restitution proceedings; and advised defense counsel on the eve of the proceedings that "[t]he only incremental Jencks is the material related to [Kathleen Val of JP Morgan Chase], which was already provided" but failed to produce 5K1.1 motions for <u>6</u> cooperating witnesses[16]; the contemporaneous emails with SA Fisher; as well as the other materials provided to the Defendants under the July 18, 2017 Certification. There is no evidence in the record as to what was actually done by AUSA Conway to comply with his obligations while the sentencing enhancement and restitution proceedings were ongoing, with the only evidence of compliance being the post-hoc review completed by his then colleagues in response to the Court's ruling.

---

[16] In fact, one of the witnesses initially listed by the Government in this email was Joel Reck and the 5K1.1 motion filed on Reck's behalf had not been produced at the time this statement was made.

The Court's Opinion pointed out numerous opportunities AUSA Conway had to fulfill his duty to timely correct the record while the proceedings were ongoing but he did not. (Docket No. 688 at 53). As the Court stated:

> the proceedings never should have advanced to the point where SA Avolia was even asked this question on May 13, 2016 [about whether a 5K1.1 motion had been filed for Roscoe] because the prosecutor should have: (1) disclosed the 5K1.1 motion and email as he told everyone had been accomplished, on October 4, 2015, prior to the commencement of the proceedings; (2) disclosed these materials prior to the testimony of SA Fisher on January 27, 2016, as this Court had ordered; (3) corrected the record immediately upon the objection lodged by Smith's counsel during SA Fisher's testimony at the January 27, 2016 session; and/or (4) disclosed the email at the conclusion of SA Fisher's direct examination, insofar as the prosecutor was adhering to a strict interpretation of the Jencks Act. Hence, the prosecutor's lack of action demonstrates a persistent failure to meet his obligations to produce this material and to timely correct the record.

(*Id*.). In addition, AUSA Conway failed to respond to the rule to show cause. And, he could have requested that the Court conduct an *in camera* review of any materials which potentially raised *Brady* issues – as had been done previously during this litigation[17] – but he did not pursue this type of relief. The Government also could have sought an interlocutory appeal of the sanctions order. Since the Government has conceded the due process violation, admitted that AUSA Conway committed misconduct for which he should be held accountable, removed him from this case, and failed to present any additional evidence from AUSA Conway in support of this motion, in the form of an affidavit or otherwise, the Court lacks a sufficient basis to withdraw its finding that he did not act in good faith. That finding was made after careful consideration of the record as it existed at the time and the Court continues to believe it remains

---

[17]     The Court notes that suspicious activity reports were presented to the Court to conduct an *in camera* review during pretrial proceedings. (*See* Docket No. 258). The U.S. Attorneys' Manual endorses such procedures as well. *See* U.S. Attorneys' Manual § 9-5.001.F ("Where it is unclear whether evidence or information should be disclosed, prosecutors are encouraged to reveal such information to defendants or to the court for inspection *in camera*, and where applicable, seek a protective order from the Court.").

appropriate given the totality of the facts and circumstances.

With respect to the Government's requests that the Court selectively delete certain of its findings, such relief is also not appropriate because the Government has failed to demonstrate that there are any manifest errors within the Court's decision. In attempting to justify a revised finding that only a "good faith" *Brady* violation occurred, the Government once again relies upon the scope of AUSA Conway's pretrial disclosures of Jencks/*Brady*/*Giglio* materials as of February 2, 2015. (Docket No. 695). But, the same arguments were previously made and overruled by the Court, which sanctioned the Government for AUSA Conway's mishandling of the sentencing and restitution phase of this litigation, i.e., the events taking place from February 16, 2015 onward, as described in the June 14, 2017 Memorandum Opinion and highlighted above. (*See* Docket No. 688). The Government's motion for reconsideration also does not address the Court's alternative rationales for the sanctions including the violations of the Jencks Act, and the Court's Order, (Docket No. 494), which was broader in scope than *Brady/Giglio* and would independently support sanctions. The remaining matters complained of by the Government constitute disagreements with the Court's discretionary rulings which plainly do not support reconsideration under prevailing law. *See Perminter*, 2012 WL 642530, at *7.

V. CONCLUSION

The Court holds that the Government failed to meet its heavy burden to demonstrate that it should reconsider its June 14, 2017 Memorandum Opinion by withdrawing or amending certain findings with which the Government disagrees. *See Dupree*, 617 F.3d at 732-33; *Kalb*, 891 F.3d at 467. Rather, the Court reaffirms its decision for entering the Order imposing sanctions on the Government in this case. As was previously stated,

> [i]t is this Court's duty to ensure that sentencing proceedings are fundamentally fair and that the Government adheres to its

obligations under Jencks, *Brady/Giglio* and Orders of the Court. When the Government fails in this regard, the Court must act to remedy the violations for several reasons, including: to level the playing field for these particular Defendants; to deter future violations; and to encourage better prosecutorial practice in the future.

(Docket No. 688 at 62).

On the last point, the Court recognizes that this was a significant mortgage fraud conspiracy warranting zealous prosecution and pursuit of restitution on behalf of many victims who were allegedly harmed by the scheme. At the same time, such zeal must be tempered so that justice can be done for all involved, including criminal defendants, who have rights to fundamentally fair sentencing proceedings where their sentences are not enhanced by information from a source whom the prosecutor knew was unreliable, as was attempted here. The Court would remind the Government that

> "[The prosecutor] is in a peculiar and very definite sense the servant of the law.... He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." In other words, although ours is an adversarial system, prosecutors should never allow their overarching objective to be victory. "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done." As the Supreme Court has warned, the integrity of the criminal justice system is jeopardized when prosecutors adopt tactics which are governed by the sadly mistaken and dangerous principle that victory is the primary objective of a criminal prosecution.

*United States v. Bailey*, 840 F.3d 99, 124 (3d Cir. 2016) (quoting *United States v. Berger*, 295 U.S. 78, 88 (1935)). Similarly,

> the *Brady* rule's "'overriding concern [is] with the justice of the finding of guilt,'" *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)), and that

> the Government's "'interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done,'" *Kyles v. Whitley*, 514 U.S. 419, 439, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)).

*Turner v. United States*, 137 S. Ct. 1885, 1893, 198 L. Ed. 2d 443 (2017). Consistent with these principles, prosecutors should adopt generous discovery polices under which "any information that a defendant might wish to use" is disclosed and the prudent prosecutor's "better course is to take care to disclose any evidence favorable to the defendant." *Id.* (quoting *Kyles*, 514 U.S. at 439). This Court expects prosecutors to adhere to these standards; otherwise sanctions may be imposed.

For all of these reasons, the Government's motion for reconsideration [695] is denied. An appropriate Order follows.

*s/Nora Barry Fischer*_____
Nora Barry Fischer
U.S. District Judge

Dated: September 7, 2018

cc/ecf:  All counsel of record.
     George Kubini c/o Robert Stewart, Esq.
     Dov Ratchkauskas c/o David Berardinelli, Esq.
     Sandra Svaranowic c/o William Kaczynski, Esq.
     Arthur Smith c/o Stephen Stallings, Esq.
     Hon. Scott W. Brady, U.S. Attorney